SECURITIES AND EXCHANGE COM-
MISSION, Appellant,

v.

NATIONAL SECURITIES, INC., a corporation, et al., Appellees.

No. 21146.

United States Court of Appeals
Ninth Circuit.

Nov. 14, 1967.

Philip A. Loomis, Gen. Counsel, David A. Ferber, Edward B. Wagner, M. D. Newman, W. Stevens Tucker, Attys., S.E.C., Washington, D. C., Arthur E. Pennekamp, Regional Adm., S.E.C. San Francisco, Cal., for petitioner.

Lewis, Roca, Scoville, Beauchamp & Linton, John Frank, Phoenix, Ariz., for appellees.

Before JERTBERG and MERRILL, Circuit Judges, and TAYLOR, District Judge.

JERTBERG, Circuit Judge:

Before us is an appeal under 28 U.S.C. § 1291 by the plaintiff below and appellant in this court, Securities and Exchange Commission, from a final judgment of the United States District Court for the District of Arizona granting judgment on the pleadings for the defendants below, appellees here. The action was brought pursuant to Section 21(e) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78u(e), to enjoin violations of the antifraud provisions of that Act. Sec. 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5 of that Act, 17 CFR 240.10b–5, and for other relief.

Appellant sought to undo the merger of two stock life insurance companies on the ground that the proxy solicitation material mailed to the stockholders of the two firms contained positive misrepresentation of material facts, and also failed to state material facts necessary to make the statements therein not misleading in light of the circumstances under which they were made.

Appellee National Securities, Inc. is a Colorado corporation doing business in Arizona as a holding company owning a controlling interest in the stock of National Life & Casualty Insurance Company, an Arizona corporation. Appellees Wallace, Bohannan, Saffert, Wilkins, Barrett, Setter and Large are officers of the appellees National Securities, National Life, or another subsidiary of National Securities.

Appellee Producers Life Insurance Company is an Arizona corporation which conducts a life insurance business in Arizona and other western states.

As of April 27, 1964, Producers Life had approximately 14,000 stockholders with 880,000 shares of common stock issued and outstanding, including 50,203 treasury shares. Of that total, 66,320 shares were owned directly by a group consisting of Richard G. Johnson, Ernest A. Richards, William A. Reedy, Bonnie B. Bilbrey, and Producers Thrift & Loan Company, an Arizona corporation, whose stock was owned by Johnson, Richards, Reedy, Bilbrey and one other person, the first four being referred to in this litigation[1] as the "selling directors." The selling directors, together with J. Grant Iverson, Jess E. Hunter, and John J. Falconer, made up Producers Life's board of directors. In addition, the selling directors other than Bilbrey held voting proxies for about 565,000 shares.

The amended and supplemental complaint in substance alleges that since March 15, 1964, appellees and the selling directors have made use of means and instrumentalities in interstate commerce and the mails to advance a scheme by manipulative and deceptive devices in connection with the purchase and sale of stock in Producers Life and National Life to defraud Producers Life and its stockholders by making false and misleading statements, and that since that date appellees have effected various arrangements with the ultimate purpose of merging Producers Life with National Life in derogation of the rights of Producers Life's stockholders, and contrary to the fiduciary responsibilities of the selling directors and appellees Wallace, Saffert, Wilkins, Barrett, and Large.

The complaint sets forth in detail the various acts, transactions and occurrences which transpired, leading up to the consolidation agreement of November 27, 1964, between National Life and Producers Life. The agreement provided for the submission of the agreement to the stockholders of Producers Life and National Life.

Beginning in August, 1964, appellees National Securities, National Life, Bohannan, Wallace, Saffert, Wilkins, Barrett, Setter and Large conducted a proxy solicitation campaign by mailing communications to Producers Life's 14,000 stockholders throughout the United

1. They, along with Producers Thrift & Loan Company, are not now parties to the action, the suit as to them having been dismissed without prejudice on April 16, 1965, R. 291, and appellant's motion to amend its amended complaint to include them having been denied on February 7, 1966, R. 794.

States. It is the alleged material misstatements and the alleged omission of material facts in these proxy solicitation communications of which appellant complains.

The complaint then alleges, in detail, numerous misstatements and omissions of material facts.

A special stockholders' meeting was held on April 19, or 26, 1965, at which the shareholders approved and confirmed the merger.

The complaint further alleges that following the stockholders meeting, the appellees sent false and misleading statements to the shareholders of Producers Life. It is further alleged that the consolidation agreement is void as an essential element of a fraudulent scheme and because it had never been validly approved by the requisite two-thirds majority of the stockholders.

It appears that the merger agreement was submitted to the Arizona Director of Insurance on May 7, 1965, and approved by him on July 9, 1965. It further appears that since that time the National Group has conducted the affairs of National Life and Producers Life as a single operation.

In the court below, appellant prayed for the following relief:

1. that the alleged occurrences be adjudged fraudulent and in violation of § 10(b) and Rule 10b–5;

2. that a preliminary and permanent injunction be entered against appellees to restrain them from further violations of § 10(b) and Rule 10b–5 in connection with any plan of reorganization, merger, etc., or with the solicitation of proxies to accomplish such plan;

3. that appellees rectify the consequences of their wrongful conduct and restore Producers Life, National Life, their stockholders, and appellees to their status and eco-

nomic condition as it existed prior to April 27, 1964;

4. that appellees make an accounting for their unjust enrichment and the damage to the stockholders;

5. that the equities of appellees and the stockholders of Producers Life be adjusted on a fair and equitable basis including, if necessary, the subordination of National Securities' interests in National Producers; and

6. any other relief which the court may deem just and equitable.

On September 1, 1965, appellees filed a motion for judgment on the pleadings or, in the alternative, for summary judgment. The district court granting the motion for summary judgment on the pleadings,[2] stated inter alia:

"7. Even if it be assumed that § 10 (b) would otherwise be applicable to proxy solicitations [citations omitted], and that a shareholder-approved corporate consolidation and reorganization is a 'purchase or sale' of securities within the meaning of § 10(b) and Rule 10b–5 [citations omitted], there still remains the question of whether the McCarran Act [59 Stat. 33, 15 U.S.C. §§ 1011–1015] does not preclude the application in this case of § 10(b), as implemented by Rule 10b–5;

"8. 15 U.S.C. § 1012(b) states, in part:

'No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * *';

"9. The law of Arizona requires that any proposed merger of stock insurance companies be submitted to the Director of Insurance for his approval in accordance with the criteria set forth in A.R.S. § 20–731, which reads as follows:

'A. A domestic stock insurer of any kind may merge or consolidate with another domestic or foreign

stock insurer by complying with the provisions of general law governing the merger or consolidation of stock corporations formed for profit, but subject to subsection B of this section.

'B.   No such merger or consolidation shall be effectuated unless in advance thereof the plan and agreement therefor have been filed with and approved in writing by the director of insurance.   The director shall give his approval within a reasonable time after filing unless he finds the plan or agreement:

1.   Is contrary to law.

2.   Inequitable to the stockholders of any domestic insurer involved.

3.   Would substantially reduce the security of the service to be rendered to policyholders of the domestic insurer in this state or elsewhere.';

"10.   Arizona law further provides for an appeal to the State courts from a decision of the Director of Insurance made under the authority of A.R.S. § 20–731 [see A.R.S. §§ 20–161—20–166];

"11.   Moreover, the remedies which the Securities and Exchange Commission may seek in this Court are governed by § 21(e) of the 1934 Act, which provides:

'Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder, it may in its discretion bring an action in the proper district court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.   The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter.'   [15 U.S.C. § 78u(e)];   and

"12.   The allegations of the Amended and Supplemental Complaint at bar, if taken to be true, are insufficient to warrant issuance of an injunction against future violations of § 10(b) and Rule 10b–5, since the requested relief of invalidation by this Court of the corporate merger, now finally approved by the Arizona Director of Insurance pursuant to A.R.S. § 20–731, would at least 'impair', if not 'invalidate' or 'supersede', laws enacted by the State of Arizona 'for the purpose of regulating the business of insurance', within the meaning of the applicable provisions of the McCarran Act [15 U.S.C. § 1012(b)];"

Appellant specifies that the district court erred:

"1.   [I]n granting defendants' [appellees'] motion for judgment on the pleadings on the ground that the McCarran Act precluded the application of the antifraud provisions of the Securities Exchange Act, Section 10(b), and Rule 10b–5 thereunder.

"2.   [I]n holding that it could not grant relief to 'rectify and correct the consequences' of defendants' [appellees'] unlawful conduct and that it would be inappropriate and outside the scope of relief afforded by the Securities Exchange Act for the court to grant, as part of the requested remedy, an accounting for unjust enrichment and other relief.

"3.   [T]o the extent it may have suggested that the fraudulent statements made in connection with the consolidation of Producers Life and National Life into National Producers and the fraudulent omissions in the purchase of Producers Life treasury stock were not 'in connection with the purchase or sale' of securities within the meaning of Section 10(b) of the Securities Exchange Act and Rule 10b–5 thereunder."

Appellees contend on this appeal that the suit must be dismissed for want of indispensable parties. The indispensable parties referred to are Johnson, Richards, Reedy and Bilbrey referred to earlier in this opinion as the "selling directors", and Producers Thrift & Loan Company, who are not now parties to the action. (See fn. 1.)

It is clear that the district court did not reach the question whether the consolidation of Producers Life and National Life into National Producers involved purchases or sales of securities in connection with which the alleged fraud occurred.

■ In view of the conclusion which we have reached, we shall discuss only one of the issues of law raised by appellant. That issue is whether the allegations of the amended and supplemental complaint, which allegations must be presumed by us to be true, warrant the invalidation of the merger in light of the provisions of the McCarran Act.

The preamble to the McCarran Act sets forth its purpose:

"Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011.

The Act further provides:

"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance. * * *" 15 U.S.C. § 1012(b).

The Act then makes certain federal statutes (Sherman Act, Clayton Act, and Federal Trade Commission Act) applicable to the business of insurance "to the extent that such business is not regulated by State law", and other federal statutes (National Labor Relations Act, Fair Labor Standards Act of 1938, and Merchant Marine Act, 1920) fully applicable to the business of insurance. 15 U.S.C. §§ 1012(b), 1014.

The McCarran Act was passed following the decision in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). In that case the Supreme Court held that interstate transactions in the business of insurance were interstate commerce and therefore subject to regulation by Congress under the commerce clause. This decision upset the previously long-held understanding that the business of insurance was not commerce and was subject only to state regulation. On this understanding was built a substantial structure of regulation by the states. "[T]he states took over exclusively the function of regulating the insurance business in its specific legislative manifestations. Congress legislated only in terms applicable to commerce generally, without particularized reference to insurance." Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 415, 66 S.Ct. 1142, 1147, 90 L.Ed. 1342 (1946).

Immediately after the *South-Eastern Underwriters* decision, Congress took action on previously-introduced bills to exempt the insurance business from federal anti-trust regulation. But the ultimate result was a bill which enunciated a considerably broader policy. The focus shifted from a narrow exemption from the Sherman and Clayton Acts to a general policy of exemption with specific exceptions to that policy. As was stated by the co-author of the bill, Senator Ferguson:

"If there is on the books of the United States a legislative act which relates to interstate commerce, if the act does not specifically relate to insurance, it would not apply at the present time. Having passed the bill now before the Senate, if Congress should tomorrow pass a law relating to interstate commerce, and should not specifically apply the law to the business of insurance, it would not be an implied repeal

of this bill, and this bill would not be affected, because the Congress had not, under subdivision (b), said that the new law specifically applied to insurance." 91 Cong.Rec. 481 (1945).

The following colloquy between Senator Ferguson and another major draftsman of the bill, Senator O'Mahoney, makes the same point:

"MR. FERGUSON. What we have in mind is that the insurance business, being interstate commerce, if we merely enact a law relating to interstate commerce, or if there is a law now on the statute books relating in some way to interstate commerce, it would not apply to insurance. We wanted to be sure that the Congress, in its wisdom, would act specifically with reference to insurance in enacting the law.

"MR. O'MAHONEY. In other words, no existing law and no future law should, by mere implication, be applied to the business of insurance.

"MR. FERGUSON. That is correct." 91 Cong.Rec. 1487 (1945).

It is clear that the Securities Exchange Act of 1934, appellant's statutory mainstay in this case, is grounded on Congress' power to regulate interstate commerce. See 15 U.S.C. § 78b. Cf. Preamble to Securities Act of 1933, 48 Stat. 74. There is no reference to the Securities Exchange Act in the debates on the McCarran Act. We are left then with a general intention to set the insurance business outside the scope of all existing and future legislation regulating interstate commerce, without any more direct evidence that Congress had in mind the Securities Exchange Act.[3] However, Congress was apparently seeking to define an exemption for insurance coterminous with its power to regulate interstate commerce. This is evident from sections 3 and 4 of the McCarran Act, 15 U.S.C. §§ 1013, 1014. There, Congress enumerated specific statutes, grounded

on its interstate commerce power, and the extent to which they should apply. It is significant that Congress felt that such diverse acts as the National Labor Relations Act and the Federal Trade Commission Act would otherwise have fallen within the exemption.

"MR. O'MAHONEY. * * * In drafting [the McCarran Act] we sought to spell out each particular law which might apply to insurance. We referred specifically to the Federal Trade Commission Act, the Robinson-Patman Act, the National Labor Relations Act, and the Fair Labor Standards Act. In other words, a good faith attempt was made to specify every single law which had an application, or might have an application, to insurance." 91 Cong.Rec. 483 (1945).

An equally vital purpose of the McCarran Act was to preserve intact from any federal intrusion based on the commerce clause, existing and future State regulation of the insurance industry. The commerce clause was not to be used as a springboard for federal regulation in the absence of specific statutory reference to insurance. By enacting the McCarran Act, Congress "clearly put the full weight of its power behind existing and future state legislation to sustain it from any attack under the commerce clause to whatever extent this may be done with the force of that power behind it, subject only to the exceptions expressly provided for." Prudential Insurance Co. v. Benjamin, supra, at 328 U.S. 431, 66 S.Ct. at 1155. The major proponent of the bill, Senator McCarran, himself made this same point. "In enacting this law, Congress held out an invitation to the States to deal affirmatively and effectively with those activities and practices of the insurance business which might otherwise be subject of federal regulation." McCarran, Federal Control of Insurance, 34 A.B.A.J. 539, 540 (1948). See also

3. There is evidence, however, that the role of the S.E.C. had been discussed in Congressional hearings held prior to the McCarran Act on the general subject of federal regulation of the insurance industry.

See Joint Hearing before the Subcommittee of the Committee on the Judiciary, 78th Cong., 2d Sess., pt. 6, at 640 (1944); Sen.Doc. No. 35, 77th Cong., 1st Sess. at 41–42, 45, and 596 (1941).

Donovan, Regulation of Insurance under the McCarran Act, 15 Law & Contemp. Prob. 473, 490 (1950).

The State of Arizona accepted the invitation of the McCarran Act.

"Among the purposes of this article is the regulation of trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945, 59 Stat. 33, by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." Ariz.Rev.Stat. § 20–441 (1956).

The prohibited practices are then set out in subsequent sections. See Ariz.Rev. Stat. §§ 20–442—20–456. The section of the Arizona Insurance Code relating to mergers states:

"A.   A domestic stock insurer of any kind may merge or consolidate with another domestic or foreign stock insurer by complying with the provisions of general law governing the merger or consolidation of stock corporations formed for profit, but subject to subsection B of this section.

"B.   No such merger or consolidation shall be effectuated unless in advance thereof the plan and agreement therefor have been filed with and approved in writing by the director of insurance. The director shall give his approval within a reasonable time after filing unless he finds the plan or agreement:

"1.   Is contrary to law.

"2.   Inequitable to the stockholders of any domestic insurer involved.

"3.   Would substantially reduce the security and service to be ren-

dered to policyholders of the domestic insurer in this state or elsewhere.

"C.   If the director does not approve the plan or agreement he shall so notify the insurer in writing specifying his reasons therefor." Ariz.Rev.Stat. § 20–731 (1959).[4]

The State of Arizona has affirmatively asserted its power to regulate the merger of insurance companies. It has not merely deemed such mergers to be legal, nor perfunctorily incorporated by reference its corporate merger provisions, but has set out additional standards and empowered a state agent to enforce them. The fact that these standards are not identical to those in the federal securities laws is not sufficient to allow the engrafting of federal standards into the merger.

"It is not required that the assertion of State regulatory authority over a particular phase or practice of the insurance business shall provide the most effective regulation possible or that it shall be equally strict as the applicable federal law in the same field. Congress has recognized the right of the States to apply their own public policy in the regulation of the business of insurance. The important thing is that the State, with respect to the particular field of insurance or sphere of insurance activity, or the particular practice in question, shall have asserted its authority and imposed its regulatory powers." McCarran, Federal Control of Insurance, supra, at 541–542.[5]

Some light is shed on this problem by the enactment of the Securities Acts Amendments of 1964, 78 Stat. 565 (1964), effective in 1966, insofar as their legislative history displays Congress' current understanding of the scope of the McCarran Act.[6]

4.   The 1967 amendment to this section, effective January 1, 1968, makes special provision for title insurers but otherwise leaves the section intact.

5.   See, to the same effect, communication to the Yale Law Journal from Senator McCarran, dated April 21, 1950, quoted

in Note, 60 Yale L.J. 160 at 163, n. 11 (1951).

6.   The House Committee Report includes the following:

"This committee amendment [excluding insurance companies on certain condi-

As stated by the district court in its order granting judgment of dismissal:

"4. The acts complained of would fall within the prohibitions of the proxy-solicitation-anti-fraud provision of § 14 of the 1934 Act [15 U.S.C. § 78 (n)], as implemented by Rule 14a–9 [17 CFR 240.14a–9], but for the fact that the stock of the insurance companies involved has never been registered on any national securities exchange;

"5. Not until sometime during 1966 will the coverage of § 14 be extended, by virtue of the act of August 20, 1964 [78 Stat. 569], to any corporation similarly situated to the insurance companies involved in this action; and then only if not exempted by new § 12 (g) (2) (G) of the 1934 Act [15 U.S.C. § 78(l) (g) (2) (G)] which excludes 'any security issued by an insurance company' provided the insurance com-

pany is subject to certain defined State regulation;" [7]

The Committee Report indicates the continued solicitude of the Congress for state regulation of the insurance business, including practices related to insurance stocks.

■ We are in accord with the views expressed by the district court that:

"[T]he requested relief of invalidation by this Court of the corporate merger, now finally approved by the Arizona Director of Insurance pursuant to A.R.S. § 20–731, would at least 'impair', if not 'invalidate' or 'supercede', (sic), laws enacted by the State of Arizona 'for the purpose of regulating the business of insurance', within the meaning of the applicable provisions of the McCarran Act [15 U.S.C. § 1012 (b)]."

The judgment appealed from is affirmed.

---

tions] was adopted following testimony by a number of State insurance commissioners and representatives of stock insurance companies who unanimously opposed the subjecting of these insurance companies to the jurisdiction of the Securities and Exchange Commission in addition to the jurisdiction of the various State commissioners. Further, these witnesses opposed departure by the bill from the doctrine embodied in the McCarran Act that the regulation of insurance companies be left to the States. The basic objection advanced by these witnesses went not to the requirements for the protection of investors for disclosure but only to the jurisdictional question.

\* \* \* \* \* \*

"The thrust of the testimony by these representatives of the State insurance commissioners was that they be given an opportunity to demonstrate their ability effectively to protect the investors as well as the policyholders. The committee amendment gives these State commissioners this opportunity so to do." 1964 U.S.Code Cong. & Admin.News, pp. 3013, 3022.

7. 15 U.S.C. § 78l(g) (2) (G) provides that the provisions of the subject section shall not apply in respect of—

"(G) any security issued by an insurance company if all of the following conditions are met:

(i) Such insurance company is required to and does file an annual statement with the Commissioner of Insurance (or other officer or agency performing a similar function) of its domiciliary State, and such annual statement conforms to that prescribed by the National Association of Insurance Commissioners or in the determination of such State commissioner, officer or agency substantially conforms to that so prescribed.

(ii) Such insurance company is subject to regulation by its domiciliary State of proxies, consents, or authorizations in respect of securities issued by such company and such regulation conforms to that prescribed by the National Association of Insurance Commissioners.

(iii) After July 1, 1966, the purchase and sales of securities issued by such insurance company by beneficial owners, directors, or officers of such company are subject to regulation (including reporting) by its domiciliary State substantially in the manner provided in section 78p of this title."

The State of Arizona adopted legislation complying with such conditions. See Ariz. Rev.Stat. § 20–143.