**COMMANDER LEASING CO., a partnership, et al., Plaintiffs-Appellants,**

v.

**TRANSAMERICA TITLE INSURANCE COMPANY, a California corporation, et al., Defendants-Appellees.**

**No. 72–1171.**

United States Court of Appeals, Tenth Circuit.

Argued Sept. 21, 1972.

Decided April 6, 1973.

Dale Tooley, Denver, Colo. (Hugh J. McClearn, Van Cise, Freeman, Tooley & McClearn, Denver, Colo., on the brief), for plaintiffs-appellants.

Patrick M. Westfeldt, Denver, Colo. (Haradon Beatty, Denver, Colo., and Holland & Hart, Aspen, Colo., on the brief), for defendants U.S. Life Title Ins. Co. of Dallas and Lawyers Title Ins. Corp.

Aldo G. Notarianni, Denver, Colo. (Stephen Susman, Denver, Colo., Fulbright, Crooker & Jaworski, Houston, Tex., on the brief), for defendant Stewart Title Ins. Co.

Edward B. Towey, Denver, Colo. (James J. Zak, Denver, Colo., on the brief), for defendants Title Ins. Co. of Minnesota and Land Title Guarantee Co.

William H. Orrick, San Francisco, Cal. (Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., Richard M. Davis, Robert H. Harry, Donald E. Phillipson, and Davis, Graham & Stubbs, Denver, Colo., on the brief), for defendant Transamerica Title Ins. Co.

Charles H. Haines, Jr., Grant, Shafroth, Toll & McHendrie, Denver, Colo., and John T. Loughlin, John C. Christie, Jr., Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for defendant Chicago Title Ins. Co.

Christian J. Allison, Denver, Colo., for defendant Pioneer Nat. Title Ins. Co.

Edward I. Haligman, Atler, Haligman & Atler, Denver, Colo., for defendant Denver Abstract Co., d/b/a Titles, Inc.

Hugh A. Burns, Dawson, Nagel, Sherman & Howard, Denver, Colo., for defendants American Title Ins. Co., First American Title Ins. Co., St. Paul Title Ins. Corp., and Standard Title Ins. Co.

Francis S. Mancini and Charles J. Hafertepen, Denver, Colo., for defendant Commercial Standard Ins. Co.

Before LEWIS, Chief Judge, and JONES * and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

The issues here to be resolved are whether the "business of title insurance" is the "business of insurance" within the meaning of that phrase as used in the McCarran-Ferguson Act and whether the State of Colorado "regulates" the business of title insurance to the end that by reason of the McCarran-Ferguson Act the Sherman and Clayton Acts are not applicable to certain title insurance companies doing business in Colorado. The McCarran-Ferguson Act will hereinafter be referred to as the McCarran Act.

The trial court in granting the defendant's pre-trial motions to dismiss held that the business of title insurance was the "business of insurance" and that the State of Colorado did regulate the title insurance business to the end that under the McCarran Act a private antitrust action would not lie against certain title insurance companies doing business in Colorado. We agree with this holding.

The plaintiffs in this proceeding ·are Commander Leasing Co., a partnership, and Richard B. Eichenberger and Hilda J. Eichenberger, individually and on behalf of others similarly situated. Commander alleged that it had purchased title insurance from one of the defendants, namely, Transamerica, for six years. The Eichenbergers alleged that they had purchased title insurance both from Transamerica and one of the other defendants, namely, Lawyers Title Insurance Corporation.

Two of the fourteen defendants, namely, Denver Abstract Co., doing business as Titles, Inc., and Land Title Guarantee Company, are Colorado corporations which serve as local agents for foreign title insurance companies and are otherwise engaged in what plaintiffs characterize as the "business of providing title proof and assurance."

The remaining twelve defendants are title insurance companies formed under the laws of states other than Colorado but qualified to do business in Colorado and which, according to the plaintiffs, are engaged in the "business of providing title proof and assurance and abstracting." We note that throughout their complaint the plaintiffs steer away from using the word "insurance" in describing the defendants' activities and, no doubt for euphemistic reasons, seem to prefer to use the word "assurance." This distinction is in our view of no great import.

Jurisdiction is based on 15 U.S.C. §§ 15 and 26, the plaintiffs seeking treble damages and injunctive relief. The action is sought to be maintained as a class action under Fed.R.Civ.P. 23(a), and in this regard it is alleged that "since July 9, 1965, thousands of persons have purchased title proof and assurance and abstracting from defendants in connection with real estate transactions within the State of Colorado * * *."

By way of general allegations, the plaintiffs aver that prior to 1950 abstracts of title, certified to the date of each transaction by an abstract company, were utilized in connection with proof of

---

* Of the Fifth Circuit, sitting by designation.

title in real estate transactions in Colorado, but that since that time the use of abstracts of title has sharply declined and the "use of so-called title insurance as title proof and assurance" has sharply increased. In this same general connection it is alleged that the abstract companies have now to a large extent been purchased or acquired by the title insurance companies, with certain of the defendants having thus acquired numerous abstract companies. It is then generally alleged that the defendants now have "a monopoly of title information and have conspired to fix uniform and excessive prices for abstracting and for so-called title insurance, to limit competition and to retire abstracts of title in favor of so-called title insurance." The plaintiffs go on to allege that the "title proof and assurance" sold by defendants is not "insurance" and is not regulated by state law.

The complaint then sets up five claims for relief. We shall refer to each. Before doing so, we note that underlying the entire complaint is plaintiffs' belief that in their purchase of title insurance from the defendants they have been charged a noncompetitive, monopolistic price. So, regardless of the fact that the complaint sets up five separate claims, and regardless of the further fact that the complaint asks for injunctive relief as well as treble damages, plaintiffs' constant target is the allegedly noncompetitive and excessive charge made by the several defendants for their title insurance.

Plaintiffs' first claim is directed against all defendants and in essence is a claim for price fixing based on § 1 of the Sherman Act, 15 U.S.C. § 1. A bit more specifically, plaintiffs allege in this claim that the defendants have conspired to fix, and have in fact fixed, arbitrary and noncompetitive charges for the issuance of their title insurance policies.

Plaintiffs' second claim is also directed against all defendants and is based on § 2 of the Sherman Act, 15 U.S.C. § 2, charging that the defendants through their acquisitions of abstract companies and otherwise have conspired to obtain a monopoly in "title proof and assurance and abstracting within the State of Colorado" for the purpose of eventually terminating the use of abstracts of title in favor of title insurance. It is further alleged that as a direct result of defendants' monopolistic activities plaintiffs and their class have been overcharged for title insurance.

Plaintiffs' third claim is likewise directed against all defendants and is based on the Robinson-Patman Act, 15 U.S.C. § 13, for alleged price discrimination. In this regard, it is alleged that the defendants have sold their title insurance to plaintiffs at a so-called "regular rate," which was substantially greater than the so-called "subdivider rate" charged others.

Plaintiffs' fourth claim seeks relief from all defendants and is based on Colorado statutory law prohibiting illegal restraint of trade and unlawful conspiracy. CRS 55–4–1, 2 and 8. Again, plaintiffs allege that they have been overcharged as a result of defendants' actions.

Plaintiffs' fifth and final claim is against one defendant only, namely, Transamerica Title Insurance Company, and is based on Transamerica's allegedly unlawful acquisition in Colorado of abtract companies and title insurance companies in violation of § 7 of the Clayton Act and § 2 of the Sherman Act, as well as in violation of CRS 55–4–1 et seq. Again, plaintiffs' complaint is that as a result of Transamerica's activities they, the plaintiffs, have been overcharged in their purchase of title insurance.

The defendants by either motions to dismiss or by answer raised the issue as to whether by virtue of the McCarran

Act, 15 U.S.C. §§ 1011–1015,[1] the federal antitrust laws are applicable to the business of title insurance in Colorado.

As indicated, the trial court, after full argument and briefing of the matter, granted the several motions to dismiss. In so doing, the trial court reasoned as follows: (1) Title insurance is "insurance" within the meaning of that word as used in the McCarran Act; (2) the State of Colorado has "not only" regulated the title insurance business, but has done so in "great detail"; (3) therefore, insofar as the plaintiffs' claims are based on federal antitrust acts, which included plaintiffs' first, second, third and fifth claims, such are "subject to the exclusion or are barred by the McCarran Act"; and (4) plaintiffs' fourth claim based on an alleged violation of the Colorado antitrust and restraint of trade laws should be dismissed for lack of pendent jurisdiction.

The trial court in entering its judgment dismissing the action did so without prejudice to the right of the plaintiffs, or any of them, to file an amended complaint based on alleged violations of federal and state antitrust laws in connection with "abstracting service furnished *separate and apart* from the issuance of a title [insurance] policy * * *." (Emphasis added.) In this regard, the trial court viewed the complaint insofar as it related to abstracting services as one aimed at "abstracting service furnished in connection with the issuance of a title insurance policy" and opined that any abstracting service furnished by the defendants leading up to the issuance of a title insurance policy as not being a "separate business," but a "condition precedent" to the issuance of the title policy. This particular matter will be examined in more detail later. It is sufficient now to simply note that it was for this reason that the trial court's judgment preserved the right to plaintiffs to file an amended complaint based on federal and state antitrust violations in connection with the furnishing of abstracting services *not connected* with the issuance of a title insurance policy, such activity in the trial court's opinion not being covered by the McCarran Act. No such amended complaint was ever filed and the plaintiffs now appeal the dismissal of their action.

In this court, the plaintiffs present six points: (1) The defendants' activities, and particularly their charge for processing and examining evidence of title, do not constitute the "business of insurance" and in any event such activities are not regulated by the State of Colorado; (2) any purported regulation by the State of Colorado is a sham and mere pretense, therefor the McCarran Act is inapplicable; (3) if not a sham and mere pretense, the purported regulation by the State of Colorado is not "effective" or "meaningful"; (4) in no event

---

1. "§ 1011. *Declaration of policy*
"Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."
"§ 1012. *Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948*
"(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

is plaintiffs' fifth claim barred by the McCarran Act; (5) the McCarran Act is not available to two of the fourteen defendants, namely, the two domestic corporations serving as agents for foreign title insurance companies; and (6) the trial court should have entered final orders with respect to pending settlements. Before considering each of these matters, a bit of historical background may help.

In 1868 the Supreme Court in Paul v. Virginia, 75 U.S. 168, 19 L.Ed. 357 (1868), held that the issuance of a policy of insurance, even though the parties thereto were domiciled in different states, was not interstate commerce, but only a simple contract of indemnity against loss and subject to regulation by the state. In line with this pronouncement it was thereafter generally assumed that the Sherman Act and other federal antitrust laws were inapplicable to the insurance business. However, that assumption proved to be erroneous when the Supreme Court in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), held that a fire insurance company which conducted a substantial part of its business across state lines was engaged in interstate commerce and subject to the Sherman Act. The reaction of Congress to the *South-Eastern* decision was the prompt enactment of the McCarran Act, set forth above. The effect of this Act was to permit continued regulation by the several states of the business of insurance to the end that such business was exempt from the provisions of the Sherman and Clayton Acts, including the Clayton Act's 1936 amendments, known as the Robinson-Patman Act, to the extent that such business was regulated by state law.

It is first argued by plaintiffs that the trial court erred in holding that the "business of title insurance" was included within the meaning of the phrase "business of insurance" as the latter is used in the McCarran Act. In support of this phase of their argument, counsel zeroes in on the fact that when the defendants issue a policy of title insurance only a part of the fee charged therefor is a "premium" charge, with the balance of the fee constituting a so-called "service charge." For illustrative purposes, it is said that the "regular rate" which all of the defendants charge for issuance of a title insurance policy in the amount of $5,000 is $75, with only $14 of that amount representing a so-called premium charge, and the balance thereof, namely, $61, being a service charge covering the expense incurred by the title insurance company in connection with "procuring and examining evidence of title" which precedes the issuance of any title insurance policy. Like the trial court, we are of the view that the business of title insurance cannot be thus fragmented in the manner sought by counsel.

In United States v. Home Title Insurance Company, 285 U.S. 191, 52 S.Ct. 319, 76 L.Ed. 695 (1932), the Supreme Court, in an admittedly different context, held that a title insurance company was an "insurance company." In so holding the Court recognized that "preliminary" to the issuance of a title insurance policy the title insurance company prepared abstracts and conducted an examination of the title and that its fee for a title insurance policy was based on a scale dependent on the face amount of the policy and "included fees for examinations, searches, and other sources incident to the transaction."

Similarly, in Real Estate Title Ins. Co. v. District of Columbia, 82 U.S.App.D.C. 170, 161 F.2d 887 (1947), it was held that a title insurance company was an insurance company and in so doing rejected the argument that a title insurance company was a mere title examiner. In thus holding, it was observed that the business of the title insurance company there under consideration consisted solely of issuing either "certificates of title" or "title policies" to real estate, plus "such further incidental transactions as relate to these main objectives."

SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), which will be referred to in more detail later, has bearing on this particular phase of the controversy. In that case, the Supreme Court indicated that the fixing of insurance rates was a part and parcel of the "business" of insurance and the Court then went on to state that "other activities of insurance companies [which] relate so closely to their status as reliable insurers * * * must be placed in the same class." Examination of evidence of title preparatory to issuance of a title insurance policy would certainly seem to fall easily into this latter category.

■ Our attention has not been directed to any case where the business of title insurance has been held to constitute the business of insurance within the meaning of that phrase as used in the McCarran Act. However, based on the foregoing authority, we agree that title insurance is insurance as that word is used in the McCarran Act, and our conclusion is in nowise altered by the fact that prior to the issuance of a title insurance policy the defendants make an examination of title and include in the rate ultimately charged the purchaser of such insurance a charge therefor.

The McCarran Act exempts the "business of insurance" from the antitrust provisions of the Sherman and Clayton Acts if such be regulated by the state wherein the alleged violations occurred. We must now turn to Colorado law to ascertain whether the defendants are regulated in that state.

In 1969, the Colorado Legislature enacted The Title Insurance Code of Colorado which now appears as a separate article in the chapter on insurance. CRS 72–26–1 et seq. By this enactment the State brought together in one place its regulation of both domestic title insurance companies and foreign title insurance companies doing business within the State. This particular article provides for what appears to us as a rather comprehensive set of regulations for title insurance companies and specifically provides that title insurance rates shall be regulated in the manner provided for regulation of casualty and surety insurance as provided for in CRS 72–12–1 et seq.

Prior to 1969, the provisions of CRS 31–12–1, et seq., regulated domestic title and guaranty companies with such companies being subject to regulation by the State Bank Commissioner. Prior to 1969, foreign title insurance companies were subject to the rate regulations contained in CRS 72–12–1 et seq.

Both domestic and foreign title insurance companies are and have been subject to the general regulatory powers vested in the State Insurance Commissioner by the provisions of CRS 72–1–1 et seq. The foregoing Colorado statutes directly regulate the business of title insurance.

■ To round out the picture, Colorado has enacted statutes relating to unfair methods of competition in the business of insurance which are found in CRS 72–14–1 et seq. Finally, the State of Colorado has an unfair practices act and an illegal restraint of trade act which are applicable to the business of title insurance. CRS 55–2–1 et seq. and CRS 55–4–1 et seq. Action under these particular statutes may be instituted by the State for injunctive relief or by private parties who have been injured for damages. We do not deem it necessary to further elaborate in this regard. Suffice it to say, we agree fully with the trial court's belief that the "State of Colorado not only has regulated the title insurance business but has done so in great detail."

In their complaint, the plaintiffs have characterized the State of Colorado's purported regulation of the title insurance business as a "mere sham and a pretense" and not affording "effective" and "meaningful" regulation. Such represents an effort to bring the plaintiffs within certain language in Federal Trade Commission v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), which would indicate that the

McCarran Act would not bar federal regulation when the state regulation was a "mere pretense." However, plaintiffs' conclusory allegation of "pretense and sham" does not stand up when the aforementioned Colorado regulatory statutes are examined.

In this general connection, language appearing in Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), is appropos. In that case, the Supreme Court in discussing the McCarran Act comments as follows:

"Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects.

"Moreover, in taking this action Congress must have had full knowledge of the nation-wide existence of state systems of regulation and taxation; of the fact that they differ greatly in the scope and character of the regulations imposed and of the taxes exacted; and of the further fact that many, if not all, include features which, to some extent, have not been applied generally to other interstate business. *Congress could not have been unacquainted with these facts and its purpose was evidently to throw the whole weight of its power behind the state systems, notwithstanding these variations.*" (Emphasis added.)

Ohio AFL-CIO v. Insurance Rating Board, 451 F.2d 1178 (6th Cir. 1971), cert. denied, 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972), is also helpful in resolution of the present controversy. That case involved a suit for injunctive relief and treble damages for violation of the Sherman Act based on the fixing of prices for automobile insurance premiums. The trial court dismissed the action for lack of jurisdiction over the subject matter under the McCarran Act. In upholding this action, the Sixth Circuit rejected the claim that the Ohio scheme of regulation was "deficient," with the following comment:

"An ideal type of regulation may possibly envision the removal of the alleged deficiencies in the Ohio statutes referred to by the appellant. Yet the question before us is not whether the Ohio method of regulation compares favorably with the regulation of other states, or whether it is an ideal manner in which to regulate the business of insurance. We are confident that Congress in enacting the McCarran Act did not intend to impose a uniform standard of regulation upon all of the states. It is our view that the congressional intent was to leave *to the judgment of each state* the specifics of regulation which it should see fit to adopt. Suffice it to say at this point that we are confident that the comprehensive plan adopted by Ohio is fully adequate to meet the requirements of regulation contemplated by the *McCarran Act.*"

Application of the foregoing leads us to conclude that our present task is to determine only whether the State of Colorado has regulated the business of title insurance, and not to determine whether this regulation could be better and more effectively done.

Before considering plaintiffs' next contention that under no circumstance can the McCarran Act bar their fifth claim, we would make further reference to SEC v. National Securities, Inc., *supra*. In that case, the *SEC* brought a 10(b) proceeding against an insurance company based on alleged misrepresentations made by the insurance company in connection with a proposed merger with another insurance company. The state

there in question, namely, Arizona, had enacted certain statutes regulating the relationship between an insurance company and its shareholders. The trial court dismissed the proceeding on the basis of the McCarran Act and the Ninth Circuit affirmed. 387 F.2d 25 (9th Cir. 1967). In reversing, the Supreme Court had occasion to reexamine the McCarran Act and in so doing made the following pertinent comment:

"Given this history, the language of the [McCarran] statute takes on a different coloration. The statute did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the *business* of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; that is what South-Eastern Underwriters was all about. The selling and advertising of policies * * * and the licensing of companies and their agents * * * are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia held was not 'commerce.' The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was —it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, direct-ly or indirectly, are laws regulating the 'business of insurance.'

"In this case, Arizona is concerning itself with a markedly different set of problems. It is attempting to regulate not the 'insurance' relationship, but the relationship between a stockholder and the company in which he owns stock. This is not insurance regulation, but securities regulation. It is true that the state statute applies only to insurance companies. But mere matters of form need not detain us. The crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies. Such regulation is not within the scope of the McCarran-Ferguson Act."

We do not read SEC v. National Securities, Inc., *supra*, as dictating a reversal of the judgment entered in the instant case, as has been suggested. In that case the holding was that the McCarran Act did not bar an action brought by the SEC under the Securities and Exchange Act against an insurance company which was seeking a merger with another insurance company and in its attempt to secure the merger was making misrepresentations and omissions of material facts in communications sent the shareholders in the company sought to be thus merged, notwithstanding the fact that the state there involved had state law regulating the relationship between insurance companies and their shareholders. In so holding, the Supreme Court noted that the contemplated merger of two insurance companies was not a part and parcel of the "business of insurance." We are not here concerned with any merger problem and in our view it does not follow from SEC v. National Securities, Inc., *supra*, that the McCarran Act does not bar an action brought by a policyholder of title insurance against various title insurance companies based on an alleged overcharge for the policy thus purchased, the overcharge allegedly resulting from price fix-

ing, price discrimination and monopolistic practices by the title insurance companies thus sued, assuming of course that the state in question regulates the business of title insurance. And, as indicated, we are of the view that the McCarran Act does bar such proceeding by a policyholder.

■ We shall next proceed to a consideration of plaintiffs' contention that under no circumstance can the McCarran Act bar its fifth claim. As indicated, the fifth claim is directed against Transamerica only, and is grounded on Transamerica's acquisition of stock and assets of abstract companies and other title insurance companies which was claimed to have been in violation of § 7 of the Clayton Act, 15 U.S.C. § 18, § 2 of the Sherman Act, 15 U.S.C. § 2, and CRS 55–4–1 et seq., and to have resulted in an overcharge to the plaintiffs for title insurance sold them by the defendants. So, the fifth claim, as is true with all of the claims, is tied directly into the charges made by the defendants for title insurance. And, as was stated in SEC v. National Securities, Inc., *supra*, "[c]ertainly the fixing of rates is part of this business [of insurance] * * *." Such being the case, we see no reason for handling the fifth claim any differently than the first three claims. All claims stem from the rate charged for title insurance, the separate claims merely asserting that the overcharge resulted from either price fixing, or price discrimination or illegal and monopolistic practices, with the end result always being an alleged overcharge. So, regardless of the particular activity of the several defendants complained about in the separate claims, the entire complaint boils down to a charge that the plaintiffs paid a noncompetitive rate for title insurance purchased from the defendants. It is on this general basis that we believe the McCarran Act applies to all of the claims set forth in the complaint.

In sum, then, (1) in our view the business of title insurance is included in the phrase "business of insurance" and such is not altered by the fixed "service charge" included within the rate charged by defendants for their title insurance; (2) the charges made by these defendants to plaintiffs and others for title insurance is a definite part of the *business of insurance*; (3) the State of Colorado has regulated the business of title insurance, both directly and indirectly; and (4) therefore the McCarran Act is a bar to the present proceeding which is grounded on an alleged overcharge by defendants for title insurance sold to the plaintiffs.

■ The plaintiffs also argue that the two Colorado corporations, namely, the Denver Abstract Company, doing business as Titles, Inc., and Land Title Guarantee Company, are not title insurance companies, as such, but only local agents for foreign title insurance companies, and that accordingly these two defendants should not in any event have been dismissed from the case. In this regard, the plaintiffs appear to contend that as to these two defendants their only complaint relates to abstracting services, and not the issuance of title insurance. As noted above, the trial court in its order of dismissal granted the plaintiffs the right to file an amended complaint grounded solely on antitrust violations in connection with abstracting services. This was not done. Hence, in the present posture of the case, we assume, as did the trial court, that the complaint against these two particular defendants is tied into the business of issuing title insurance. In applying the McCarran Act, we see no reason to distinguish between a principal and an agent. It would appear to us that an insurance agent, as well as an insurance company, is engaged in the "business of insurance."

One phase of this controversy gives us some concern, but such relates to a matter that is not really before us. Certain of the defendants apparently entered into a settlement with the plaintiffs, with such settlements being given preliminary approval by the trial court. These settling defendants at the same time were actively pushing their respective motions

to dismiss. Before the trial court made any final approval of these proposed settlement agreements, the motions to dismiss came on for hearing and, as indicated, were granted and a judgment of dismissal entered. In this court, the defendants who settled their cases ask us to affirm the dismissal order but at the same time remand the matter to the trial court for its final approval of the settlement agreements. As indicated, we are of the firm view that the only matter before us at this time is the propriety of the trial court's dismissal of the action based on the provisions of the McCarran Act.

Judgment affirmed.