Harlan SCHWARTZ and Daniel T. Danzi, Jr. on behalf of themselves and all others similarly situated

v.

COMMONWEALTH LAND TITLE IN-SURANCE COMPANY et al.

Civ. A. No. 71-2566.

United States District Court,
E. D. Pennsylvania.

Feb. 20, 1974.

S. Gerald Litvin, Dennis H. Eisman, Philadelphia, Pa., for plaintiffs.

Franklin Poul, Robert W. Sayre, Bancroft D. Haviland, Arsen Kashkashian, Jr., Gilbert B. Abramson, Gerald A. Dennehey, Theodore W. Flowers, Arnold Levin, Philadelphia, Pa., Robert James Jackson, Chester, Pa., Jeffrey A. Less, George F. Shinehouse, Jr., Eugene F. Brazil, Philadelphia, Pa., Harold Patton, Levittown, Pa., Rod J. Pera, Harrisburg, Pa., John C. Christie, Jr., Chicago, Ill., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is an antitrust case. Before us are the motions of all defendants to dismiss the complaint for failure to state a claim upon which relief can be granted, under F.R.Civ.P. 12(b)(6). Defendants are title insurance companies or agents, and the rating bureau for Pennsylvania title insurance companies. Plaintiffs are two individuals who sold real property to buyers who purchased title insurance on that property from some of the defendants. At issue is the fee charged to plaintiffs and other sellers of real estate at closings held in the defendants' offices. This seller charge [1] was instituted in 1967 by the companies to cover part of the expense of performing services inuring to the benefit of the seller, consisting generally of the mechanical arrangements incident to a sale of real property.[2] Prior to that time the title

---

1. Originally $10 per closing, the charge was increased to $12.50 in 1970, and again in 1973 to a figure that varied with each transaction.

2. The title company enables the seller to perform his agreement to convey insurable title, provides an office and skilled services in making final computations and adjustments, assists the seller in clearing the title by appropriate affidavits, escrowing funds and paying off mortgages, judgments and tax liens, providing transfer stamps, and taking care of recording everything necessary (and in proper order) to convey a clear title to the buyer. Among the services which the title insurance company performs on behalf of the seller are the issuing of proceeds checks, the affixation of notarial seals, obtaining a variety of certificates or receipts, filing documents of record, and dealing with mortgage payoffs, judgment satisfactions, real estate commissions, real estate taxes, water and sewer rents, transfer taxes, roof certificates, plumbing certificates, termite certificates, electric certificates, rent adjustments, attorney's fees, zoning and use certificates, placement fees, FHA application fees, inspection fees, inheritance taxes, mortgage premiums, and municipal improvements, etc.

companies' entire charge for insurance and services was paid by the buyer.

Because the seller charge, like all other title insurance rates, was set at a level agreed upon by all the companies through their rating bureau, the basis of plaintiffs' complaint is that in instituting the seller charge, the defendants conspired to fix prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[3] For purposes of the motion to dismiss, of course, the facts pleaded in the complaint are taken as true. Succinctly stated, the relevant allegations are that the defendants agreed among themselves to charge a fixed fee from any seller of real estate whose buyer purchased title insurance from a title company doing business in Pennsylvania, where the closing took place in Pennsylvania, in violation of the antitrust laws. The complaint seeks injunctive relief and treble damages for members of a class of plaintiffs consisting of all persons who paid the seller charge to any of the defendants.

The sole ground underlying the motions to dismiss presently before us is that the seller charge, like the title companies' rates charged to buyers, is exempt from the Sherman Act prohibition by virtue of the McCarran-Ferguson Act of 1945.[4] Basically, that statute leaves the states free to regulate "the business of insurance" and exempts such business from the Sherman Act, Clayton Act, and Federal Trade Commission Act to the extent that such business is regulated by state law. The broad issues raised by these motions are, accordingly, (1) whether the seller charge is comprehended within the term "the business of insurance," and (2) whether the seller charge is "regulated by state law." Before we directly address these issues, a review of the regulation of title insurance in Pennsylvania will be helpful.

II. *The Statutory Scheme For Regulation of Title Insurance in Pennsylvania*

The title insurance industry in Pennsylvania is pervasively regulated by the Insurance Department ("Department") pursuant to statute in the manner hereinafter described.[5]

---

3. That provision reads as follows:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

4. 15 U.S.C. §§ 1011–1015. The portions pertinent to this litigation are:
 § 1011. Declaration of Policy
 Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
 § 1012. Regulation By State Law; Federal Law Relating Specifically to Insurance; Applicability of Certain Federal Laws After June 30, 1948.

 . . . . .

 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Pro-

vided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
 § 1013. Suspension Until June 30, 1948, of Application of Certain Federal Laws; Sherman Anti-Trust Act Applicable to Agreements to, or Acts of, Boycott, Coercion, or Intimidation.
 (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

5. In this opinion we will not be concerned with all of the statutory provisions applicable to insurance. We will make reference only to the Insurance Unfair Practices Act, 40 Pa.Stat.Ann. §§ 1151–1162, and to Article VII ("Title Insurance Companies") of the Insurance Company Law of 1921, 40 Pa. Stat.Ann. §§ 910–1 to 910–54.

All title insurance companies transacting title insurance business within Pennsylvania must be incorporated under Pennsylvania title insurance law or licensed by the Department of Insurance to transact title insurance business in Pennsylvania, 40 Pa.Stat.Ann. §§ 910–1(3), 910–4, 910–22.

Domestic and foreign corporations are subject to stringent financial requirements. These requirements cover such areas as the minimum capital of the insurance company, impairment of capital, and paid-in initial surplus, §§ 910–5, 910–6. Reserves against unearned premiums and unpaid losses are regulated, as are the types of investments into which a title insurance company may place its capital, §§ 910–14 to 910–18, 910–32 to 910–35.

The Commissioner of Insurance is empowered to examine all changes in control of the ownership of title insurance companies and to satisfy himself of the character, experience, and financial responsibility of those acquiring control, and that the change will not jeopardize the public interest, § 910–53. Similarly, all proposed mergers and consolidations of domestic title insurance companies with either domestic or foreign title insurance companies and the corporate acquisitions of domestic companies must be filed with and approved by the Commissioner, §§ 910–51, 910–52.

The power of title insurance companies to insure titles is statutorily defined, § 910–8. There are also further statutory restrictions on their business. They are prohibited from guaranteeing the payment of mortgages on real property, §§ 910–9, 910–10; from engaging in the banking business, § 910–11; from acting as a trustee, guardian, or similar fiduciary, § 910–12; and from issuing insurance other than title insurance, § 910–13. The foregoing regulation aimed primarily at the structure and powers of title insurance companies is accompanied by extensive regulation of their title insurance operations.

Before issuing a policy, every title insurance company must conduct a title search, and the abstract of title or search report must be preserved for at least 20 years after issuance of the policy, § 910–7. The form of title policies is subject to disapproval by the Commissioner, 40 Pa.Stat.Ann. § 477b.

All agents for title insurance companies must be licensed by the Commissioner, § 910–26. They must keep their books and records, which are open to the Commissioner, in such a form that the Insurance Department can readily ascertain whether the law is being complied with, and they must reply promptly in writing to the Department's inquiries.

The rates a title company charges are fully regulated. Every classification, rule, plan, schedule of fees, and commission must be filed with the Department for its approval, § 910–37. Every rate filing must be accompanied by a statement of justification, which becomes a public record after the rate becomes effective, § 910–38. In reviewing the filing, the Commissioner must consider a number of factors including, *inter alia,* the past and prospective loss experience of the company, expenses, revenues, and a reasonable margin for profit. Under the law, rates may not be higher than necessary to enable title insurance companies to pay their expenses and losses and to make a reasonable profit, § 910–39. Determination of what is a "reasonable" profit must include (1) the rates of profit of other industries, (2) the desirability of rate stability, (3) the necessity of growth in assets in times of prosperity to protect the financial solvency of title insurance companies in times of depression, and (4) the necessity for earning sufficient dividends to induce capital to be invested in title insurance companies, § 910–39.

A procedure for departmental review of the filings is set out, including hearings, a statement of reasons for a disapproval, and the opportunity to withdraw a filing, § 910–40. Moreover, public disclosure of all pertinent information is required to be made to any insured affected by a rate who has requested such information and each insurance company

must afford aggrieved persons a reasonable opportunity to present their grievances, § 910–44.

The Commissioner must, and does, provide rules and statistical plans, in as much form and detail as is necessary. These rules and plans are used by each title insurance company in reporting, on an annual basis, the composition of its business, and the loss and country-wide expense experience of it and its title insurance underwriters. The Commissioner may also require the recording and reporting of expense experience items which are specially applicable to Pennsylvania and not susceptible of determination by prorating country-wide expense experience, § 910–46.

The Commissioner regulates trade practices of the insurance companies as well, 40 Pa.Stat.Ann. §§ 1151–1162. He has authority over misrepresentations and false advertising, boycotts, intimidation, coercion, and other unfair trade practices by title insurance companies.

The statutory frame of reference clearly contemplates uniformity in title insurance company charges and joint action by the companies in connection therewith. Title insurance companies are authorized to form rating associations, which are licensed by the Commonwealth and are themselves subject to thorough regulation. The Commissioner can issue a license to a rating organization on finding that it is competent, trustworthy, and otherwise qualified, and that its constitution or articles, and its by-laws, rules, and regulations conform with the requirements of law. The duration of a license is three years. Rating organizations must furnish the Department with lists of their subscribers. All changes in the above items must be promptly reported to the Department. The association must permit any non-member title insurance companies to become subscribers to its rating services on a reasonable basis and the refusal to admit a title insurance company to subscriber status may be reviewed by the Commissioner, who has the power to order admission. Section 910–41.

Cooperation among rating organizations and among title insurance companies is specifically authorized by statute, not only in ratemaking, but in other matters within the scope of the title insurance article, § 910–41. Provision is made for interchange of information among Pennsylvania title insurance companies and also with companies in other states, § 910–46. The Commissioner may review the activities and practices of the rating organization and the companies and their cooperation and may order any practice discontinued if it is unfair or unreasonable or otherwise inconsistent with the provisions of the title insurance article, § 910–41.

Rating organizations may make filings of rates and, if they do so, the member title insurance companies need not file individually, § 910–37. Even companies which are not members may avoid the burden of making an individual filing by subscribing to the services of a rating organization. *Id.* Minority members are protected by a deviation procedure whereby they may file uniformly higher or lower rates, § 910–42. Moreover, minority members may appeal to the Commissioner from any proposed filing by their rating organization, § 910–43.

Finally, the Act provides that "the Commissioner shall have the full power and authority, and it shall be his duty, to enforce and carry out by regulations, orders, or otherwise," each and every provision of the article regulating title insurance to the full intent of that article, § 910–46. His enforcement powers include the authority to levy fines and to suspend licenses, after hearing, for failure to obey an order, § 910–48.

We will next review the background of the seller charge. The factual ingredients of that background were not pleaded in the complaint. We will note the source of the relevant facts and will comment *infra* on the relationship between these facts and the procedural ramifications of the 12(b)(6) motion before us.

## III. *History of the Seller Charge*

The seller charge of $10 per transaction was first filed with the Department by the Pennsylvania Title Insurance Rating Bureau on December 20, 1966. The filing was approved on January 18, 1967, and became effective on February 1, 1967. On February 8 the Department withdrew its approval and wrote to the rating bureau that the seller charge was not a statutorily defined "fee" and therefore need not be filed with the Department. On March 20, 1967, the Department amended and approved (after amendment) the wording of a release by the Rating Bureau to real estate agents and other interested persons announcing the continuation of the seller charge and the Department's ruling that it was not a "fee."[6] Three years later the Department's position was unchanged. On June 1, 1970, in an order disapproving a proposed rate increase, the Department specifically excluded from its disapproval a proposed $12.50 seller charge on the ground that it was not a fee and "therefore, is not a proper subject of review by this Department . . . ."[7]

As soon as we became familiar with the case, it was obvious to us that the attitude of the Insurance Department in the matter might well be decisive. A new Insurance Commissioner, Herbert S. Denenberg, had replaced former Commissioner George F. Reed following a change of administration in Harrisburg, and we did not wish to be in the position of deciding the issue before us in ignorance of the present Commissioner's position; for instance, a contemporaneous exercise of regulation over the seller charge might place the matter in a new and different light. Accordingly, we formally advised the Department of the pendency of the litigation and invited a statement of its present position on the regulatory status of the seller charge. The Department's counsel appeared at oral argument on the motion to dismiss. He followed his appearance with a statement of present position.[8] The Department still does not regard the seller charge as a "fee" within the definition in 40 Pa.Stat.Ann. § 910–1(5). But it has now overruled the unstated minor premise of its earlier position: its submission to this Court takes the position that material to be filed for Departmental approval is not limited to "fees." The Department further informed the Court that it planned to require that the seller charge be formally filed for approval.[9] In seeking to regulate the seller charge, the Department relies for support upon a number of statutory provisions. Section 910–37(a) provides:

Every title insurance company shall file with the commissioner every man-

---

**6.** While rate filings become public documents when the Department approves the proposed rates, disapproved or withdrawn filings may not be public and therefore not properly the object of judicial notice. The original seller charge filing and the ensuing correspondence were furnished to us by several of the defendants as Appendices to their joint brief on the motion to dismiss. The procedural significance of the manner in which this information comes to the attention of the Court is discussed *infra*.

**7.** Insurance Commissioner George F. Reed's order denying the 1970 rate increase may not be a public document and has been furnished to the Court by the defendants.

**8.** This memorandum of position was submitted directly to the Court by the Department and counsel for the parties were not sent copies. The Appendix to the Memorandum consisted of documents whose public char-

acter had not been determined by the Department and which the Court was requested not to release to the parties without advising the Department in advance. In fact, nearly all of these documents had already appeared in the Appendix to defendants' brief, and we made no use of the others.

**9.** Indeed, on April 7, 1973, the Department published a proposed rule requiring that the seller charge be filed for approval and forbidding its use until approval is granted. 3 Pa.Bulletin 659 (1973). The contents of the Pennsylvania Bulletin are subject to judicial notice. 45 Pa.Stat.Ann. § 1604. This proposed rule has not become final. The Pennsylvania Title Insurance Rating Bureau's most recent filing, made on July 7, 1973, includes a schedule of seller charges. *See* 3 Pa.Bulletin 1735 (1973). Public hearings on this filing began on January 29, 1974.

ual of classifications, rules, plans, schedules of fees, commissions payable to applicants for title insurance and every modification of any of the foregoing relating to the rates which it proposes to use. . . .

Section 910–37(c) provides:

> The commissioner shall make such review of the filings as may be necessary to carry out the provisions of this article.

The Department also declared reliance on section 910–46(d), which provides:

> In addition to any powers hereinbefore expressly enumerated in this act, the commissioner shall have full power and authority, and it shall be his duty, to enforce and carry out by regulations, orders or otherwise, all and singular the provisions of this article and the full intent thereof. The commissioner may make such reasonable rules and regulations not inconsistent with this article, as may be necessary or proper in the exercise of his powers or for the performance of his duties under this article.

The Department's submission to the Court also states its position with respect to existing regulation of the unfiled seller charge. It points out that "the seller's fee is considered as one factor in determining the appropriate rate for a buyer." Thus the Department's review of the title companies' accounts and profitability at the time of a rate filing necessarily includes regulatory consideration of the seller charge, because revenues derived from that charge are included in the income statements submitted to the Department.[10]

With this background material in mind, we can proceed to examine the applicable law.

## IV. The McCarran-Ferguson Act

Insurance contracts were, until 1944, held to be outside the purview of laws regulating interstate commerce. See Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869). Consequently, insurance was considered subject to regulation by the states exclusively. But in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), the Supreme Court overruled earlier precedent and, in particular, held that the antitrust laws are applicable to the insurance business. The Congressional reaction was swift. Early in 1945 the McCarran-Ferguson Act was passed, declaring that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011.[11] Congress's broad purpose in enacting the law was, in the Supreme Court's words, to "give support to the existing and future state systems for regulating and taxing the business of insurance." Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 429–430, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946).

The plaintiffs do not dispute the legality of cooperation among the title companies in setting rates charged property buyers for title insurance. Such cooperation falls clearly within the McCarran-Ferguson Act exemption. But the plaintiffs argue that when the title companies instituted a charge to *sellers* in connection with real property transactions, they stepped outside the Congressional exemption because they in essence began selling *services* to property sellers in addition to selling *insurance* to buyers. In instituting the seller charge, claim plaintiffs, the companies left behind their antitrust exemption both because they passed beyond the limits of the business of insurance, and because

---

10. Counsel for the Department directed us in this regard to the February 10, 1970, public hearing on the 1970 rate increase filing. At pages 28 and 42 of the transcript of that hearing, it is made clear that the companies' financial statements reflected their income from the seller charge and that this revenue would be taken into account by the Department in determining whether a rate increase was justified.

11. The pertinent portions of the Act are quoted in note 4, *supra*.

they moved outside the bounds of the regulatory jurisdiction of the Pennsylvania Insurance Department. Having reviewed the background of the seller charge and the state's regulatory scheme, we can examine these two issues, keeping in mind that under the McCarran-Ferguson Act, exempted activities must be (1) part of the business of insurance and (2) regulated by state law.

## A. The "Business of Insurance"

Four years ago the Supreme Court had occasion to consider the breadth of the McCarran-Ferguson exemption. In SEC v. National Securities, Inc., 393 U. S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the exemption was raised as a defense to an injunctive suit challenging the merger of two insurance companies following allegedly misleading proxy solicitations. The Court denied the exemption, finding regulation of the company-stockholder relationship not to be regulation of "the business of insurance" within the intendment of the Act. By way of exegesis of the scope of exempted activity, Mr. Justice Marshall, speaking for the Court, wrote:

> The statute did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, FTC v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and the licensing of companies and their agents, cf. Robertson v. People of State of California, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946), are also within the scope of the stat-

ute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting this relationship, directly or indirectly, are laws regulating the "business of insurance."

> In this case, Arizona is concerning itself with a markedly different set of problems. It is attempting to regulate not the "insurance" relationship, but the relationship between a stockholder and the company in which he owns stock. This is not insurance regulation, but securities regulation. 393 U.S. at 460, 89 S.Ct. at 568.

Three important cases have held that the exemption is not strictly limited to insurer-policyholder matters, where the policy of the Act is best effectuated by recognizing the exclusivity of state regulation. Those cases are FTC v. National Cas. Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); Travelers Ins. Co. v. Blue Cross, 481 F.2d 80 (3d Cir.) cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); and California League of Independent Ins. Producers v. Aetna Cas. & Sur. Co., 175 F. Supp. 857 (N.D.Cal.1959), cited in *Travelers v. Blue Cross*. *National Casualty*, the Supreme Court case, applied the exemption to the advertising practices of insurance companies. The *California League* case held that the "business of insurance" included the size of agents' commissions, because commissions were a vital factor in the ratemaking struc-

ture. *Travelers* was a competitor's antitrust claim charging Blue Cross with unreasonable restraint of trade in obtaining favorable reimbursement contracts with hospitals serving Blue Cross policyholders. All three cases allowed the exemption even though the subject of the litigation was not actual contracts of insurance. In the two cases which did not reach the Supreme Court, contracts with non-policyholders were challenged. In *California League* the contracts were with the company's agents; in *Travelers v. Blue Cross* the contracts were with providers of medical services to policyholders. Both cases found that the contracts in question were directly and substantially related to insurance ratemaking. In the *Blue Cross* case, the Third Circuit found pivotal the interrelationship of hospital payments and subscribers' rates and noted the trial testimony of the Insurance Commissioner that with respect to rates, "the contract with the hospitals and the rates to the subscribers are part of the same package and we have to regulate both of them together . . . ." 481 F.2d at 83 n. 9. The Court contrasted Hill v. National Auto Glass Co., 293 F.Supp. 295 (N.D.Cal.1968), a case which denied the exemption in the face of an allegation that Allstate, an automobile insurer, referred claimants to selected automobile glass dealers. Again stressing the importance of a significant ratemaking link, Judge Van Dusen distinguished *Hall* by explaining that "the impact on Allstate's rates of the expense of replacing automobile glass, while it might be direct, would not be substantial." 481 F.2d at 83. This emphasis on ratemaking is traceable to the Supreme Court's opinion in *National Securities*, in which the Court found from its review of the legislative history of the Act that "Congress was mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies." 393 U.S. at 458–459, 89 S. Ct. at 568. The focus on ratemaking clearly militates toward considering the

seller charge within the McCarran-Ferguson Act's scope, for the charge is itself a rate.

■ The Supreme Court has cautioned, in another context, that immunity from the antitrust laws is not lightly implied. United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). But an examination of the cases denying the McCarran-Ferguson exemption because the "business of insurance" was not involved reveals that they involved transactions or trade practices markedly different from the one in question here. *National Securities*, discussed above, concerned the merger of two insurance companies, a transaction undoubtedly of potential import to policyholders in terms of the security of their insurance contracts, but also undoubtedly of far greater impact on stockholders whose ownership shares of the companies were to be directly affected and whose ownership agreements were to be altered.

Similarly, American General Ins. Co. v. FTC, 359 F.Supp. 887 (S.D.Tex.1973), denying the exemption, involved a merger of two companies engaged in insurance and other financial activities. Fry v. John Hancock Mutual Life Ins. Co., 355 F.Supp. 1151 (N.D.Tex.1973), also denied the exemption, where the complaint alleged that the defendant illegally tied the purchase of insurance policies or irrigation equipment to its making of farm loans. Referring to *National Securities*, the court said:

> This Court is able to perceive no reason why a state statute seeking to regulate the antitrust aspects of insurance company lending is any more closely related to the "business of insurance" than a statute regulating disclosures pursuant to attempted insurance company mergers.

United States v. Meade, 179 F.Supp. 868 (S.D.Ind.1960), involved sale of stock of an insurance agency, and thus concerned ownership of an insurance business rather than its insurance activities. The cases in which the exemption has

been denied, then, are distinguishable and not controlling here.

[6] Another potential obstacle to a finding that the seller charge is within the "business of insurance" is the fact that the seller charge is applied to the seller, who is not the title policyholder.[12] This fact, plaintiffs argue, is significant inasmuch as the Supreme Court indicated in *National Securities* that the "focus" of the McCarran-Ferguson Act "was on the relationship between the insurance company and the policyholder." 393 U.S. at 460, 89 S.Ct. at 569. This language, however, is not restrictive but descriptive. The very next sentence concludes that "[s]tatutes aimed at protecting or regulating this relationship, *directly or indirectly*, are laws regulating the 'business of insurance.'" (Emphasis added.) The insurance contract is the statutory *focus*, not its perimeter. Accordingly, we must look more closely at the relationship of the seller charge to the transaction represented by the title insurance policy.

It is a matter of common knowledge and experience that in the usual situation, title insurance is indispensable to the occurrence of the real estate sale: a seller would be unable to sell his property at its reasonable value if no title company was willing to insure title. For this reason title policies are ordinarily viewed as incidental to a single sales transaction, unlike life or liability insurance policies, which provide continuing protection against unpredictable occurrences but are not usually obtained essentially to enable a planned transaction to occur. The seller is of course as much a part of the real estate transaction as the buyer, and the title policy is issued only after an examination of the validity of the *seller's* title to his property. The investigation of the risk of loss prior to deciding whether to insure that risk is clearly part of the business of insurance. Anyone who has dealt with title insurance companies knows that the cost of this investigation, which generally involves, *inter alia*, the maintenance of a title plant, far exceeds the actuarial cost of the losses incurred.[13] It is natural, then, that the investigation undertaken by the title company becomes more important than the actual insurance protection. The process of checking and perfecting title is the primary purpose for which title companies are used, more so than for pure insurance against losses resulting from title defects. The fact is that the investigation is a substitute for the risk; it obviates it or at least vastly minimizes it. When defects in title are uncovered during the search, they are cleared up if possible, and if the objections to title cannot be removed, they are excepted from the risk. Thus, title insurance companies are liable only for what they do not find, or if they become victims of false affidavits tendered to remove title objections. Against this background it would be in our view unrealistic, indeed ostrich-like, to separate the title search process from the pure insurance aspect of the title companies' activities and, as plaintiffs urge, to call only the latter "the business of insurance."

In Commander Leasing Co. v. Transamerica Title Ins. Co., 477 F.2d 77 (10th Cir. 1973), the plaintiffs, alleging monopolization, price-fixing, and price discrimination by title companies, attempted to scale the barrier of the McCarran-Ferguson Act by separating the service activities of title companies from their insurance function. The plaintiffs in *Commander Leasing* pointed out that of a $75 charge for a $5,000 title policy, only $14 represented a premium charge,

---

12. Experience tells us that in practically all cases the seller is a title policyholder, but not of the policy at issue. Often the title company in the new policy will be the same as the one on the old policy; if it is not, it will generally obtain the first title company's title report.

13. For instance, at the public hearing mentioned in n. 10 *supra*, it was testified that loss payouts and adjustments amounted to only 4%. Commissioner Reed's June 1, 1970, decision on the Rating Bureau's rate revision request states that losses on title insurance are about 5% of premiums.

while the remaining $61 was a service charge for the title company's expenses in connection with "procuring and examining evidence of title." The plaintiffs' position was rejected, and the district court granted the defendants' motion to dismiss. The Tenth Circuit affirmed. Referring to the language in *National Securities* that "other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class" as the setting of rates, the opinion remarked that "[e]xamination of evidence of title preparatory to issuance of a title insurance policy would certainly seem to fall easily into this . . . category." 477 F.2d at 83. This makes good sense.

Even if one concludes that investigation of title is part of the business of insurance, the question remains whether a charge to the seller for the value to him of these services is not the business of insurance because the seller is not the insured. The *Travelers v. Blue Cross* case discussed earlier is adequate to dispose of the proposition that insurance companies are not engaged in the business of insurance whenever they deal with non-policyholders. In *Blue Cross* the insurance company negotiated contracts with the providers to policyholders of medical services which were the subject of the insurance contract. In the present case the insurance company is exacting a charge from the party who sells the policyholder the property which is the subject of the title policy. We cannot say that the seller charge is less closely integrated with the title insurance scheme than were Blue Cross's agreements with "sellers" of medical services.

We further note that under Pennsylvania law, "title insurance" is defined to include "guaranteeing, warranting or otherwise insuring the correctness of searches relating to the title to real property," and the "business of title insurance" includes "the transacting . . . [of] any phase of title insurance." 40 Pa.Stat.Ann. § 910–1(1), (2).

These provisions would seem to indicate that the title search and other activities undertaken to perfect the title to be insured are part of the companies' insurance business.

■ In light of the foregoing discussion, we conclude that the close relationship of the provision of services for realty sellers to the realty conveyance with which title insurance is associated, requires that we hold that the institution of the seller charge is part of the "business of insurance" for purposes of the McCarran-Ferguson Act.

### B. *Regulation by State Law*

We next turn to the question of what is meant by "not regulated by State law" within the terms of the McCarran-Ferguson Act.

■■ First, and obviously, at any time that a seller charge is actually being regulated, the statutory requirement is met. This appears to be the present state of affairs in view of the Insurance Department's statement of position in this case, or at least the imminent destiny of the seller charge. Secondly, even if the seller charge was not actually regulated by the Insurance Department, the exemption would still be effective as long as the mechanism for its regulation was available. The McCarran-Ferguson Act does not require an examination into the regulatory status of every detail of the business of insurance; it is sufficient that the state regulatory scheme is comprehensive and meaningfully administered. The standard for what constitutes "regulation" within the meaning of the Act so as to activate the exemption has been examined by numerous courts. In FTC v. National Cas. Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), the insurance advertising practices case discussed above, the Supreme Court rejected an argument that state regulation had been administered too ineffectively to satisfy the McCarran-Ferguson proviso. As long as the statutory provisions are not "mere pretense," the Court said, the exemption is satisfied where the state "has

enacted prohibitory legislation which proscribes unfair insurance advertising and authorizes enforcement through a scheme of administrative supervision." 357 U.S. at 564, 78 S.Ct. at 1262.

The *California League of Independent Ins. Producers* case discussed above declared that "if a state has generally authorized or permitted certain standards of conduct, it is regulating the business of insurance under the McCarran Act." 175 F.Supp. at 860. This standard was adopted by the Sixth Circuit in *Ohio AFL–CIO v. Insurance Rating Board*, 451 F.2d 1178 (6th Cir. 1971), cert. denied, 409 U.S. 917, 93 S.Ct. 215, 34 L. Ed.2d 180 (1972). In that case proposed rate increases filed by automobile insurance companies became effective without being challenged by the Ohio Insurance Department, which did not even employ an actuary who might have the skill to examine the need for the increase. The court reviewed the Ohio insurance law, which gave the Department extensive regulatory powers comparable to those in Pennsylvania, and concluded:

> Examining the applicable Ohio statutes, we find that the state has adopted a comprehensive scheme for the regulation of automobile liability and property damage insurance, although concededly its scheme might not be as extensive or stringent as some of the other states.

451 F.2d at 1181. The opinion cited numerous cases holding the exemption valid despite alleged failures or inadequacies of state regulation. 451 F.2d at 1183–1184. In fact, the court rejected the plaintiffs' exhortation that the court should

> inquire into the question as to whether the statutes of Ohio have been effectively enforced in accordance with their terms. . . . [T]here is nothing in the language of the Mc-

Carran Act or in its legislative history to support the thesis that the Act does not apply when the state's scheme of regulation has not been effectively enforced.

451 F.2d at 1184.[14] The court agreed with the view of a Senate subcommittee reporting on insurance regulation:

> [t]he McCarran Act language, "To the extent that such business is not regulated by State law," restricts Federal authority regardless of whether the States are actively enforcing their regulations. If the States have enacted regulatory statutes, capable of being enforced within their borders, the Federal anti-trust laws would apparently not apply. In such cases, no proof would apparently be entertained as to the extent to which the law has been administratively enforced.

451 F.2d at 1184, quoting Senate Subcommittee on Anti-Trust and Monopoly, "The Insurance Industry—Aviation, Marine and State Regulation," S.Rep.No. 1834, 86th Cong., 2d Sess. 5 (1960).

Similarly, in *Commander Leasing Co., supra,* the Tenth Circuit applied the same test to the states' regulatory effort. Relying on *Ohio AFL–CIO,* the court concluded that

> our present task is to determine only whether the State of Colorado has regulated the business of title insurance, and not to determine whether this regulation could be better and more effectively done.

477 F.2d at 84. *Accord,* Steingart v. Equitable Life Assurance Soc'y, 366 F. Supp. 790 (S.D.N.Y.1973). We are satisfied that the foregoing cases state the correct standard for testing the applicability of the McCarran-Ferguson Act.

 We turn, then, to application of the foregoing standard to the regulatory scheme in Pennsylvania. That is not a

---

14. The Supreme Court's denial of certiorari in *Ohio AFL–CIO* was accompanied by a stinging dissent by Justice Douglas which sharply pointed up the extreme inadequacy of the state's regulatory *efforts* which the court of appeals was willing to overlook because the statutory scheme gave the Insurance Department adequate regulatory *powers.*

difficult application to make, after exploring at length both the statutory scheme for title insurance regulation and the cases articulating and applying the legal test. We find that the Pennsylvania regulatory statutes are comprehensive and confer virtually plenary regulatory power on the state Insurance Department, including the power to regulate the seller charge.[15] We therefore hold that this requirement of the McCarran-Ferguson Act is met in this case.[16]

Having concluded that the McCarran-Ferguson exemption applies to this case, we must still consider one further matter before entering an order. That matter is the question whether we can grant a rule 12(b)(6) motion where we have drawn on materials outside the pleadings in considering the motion.

## V. The Rule 12(b)(6) Motions

### A. The Scope of 12(b)(6)

 The proceeding before us is the defendants' motions to dismiss for failure to state a claim upon which relief can be granted. The last sentence of F.R.Civ.P. 12(b), added in 1966, reads as follows:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as

provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The addition of this sentence to the rule resolved earlier confusion over whether a motion to dismiss for failure to state a claim was limited strictly to the pleadings or whether such motion could be supported by affidavits or other material (the so-called "speaking" motion, see 2A J. Moore, Federal Practice ¶ 12.09 (2d ed. 1972)). *See* Gallup v. Caldwell, 120 F.2d 90 (3d Cir. 1941), and Victory v. Manning, 128 F.2d 415 (3d Cir. 1942), sanctioning "speaking" motions to dismiss. The addition to the rule, however, furnished a procedure for dealing with "speaking" motions by treating them as summary judgment motions. Thus the 12(b)(6) motion to dismiss became, and remains, a motion based on the pleadings (on just the complaint, if the motion is filed before an answer) which does not permit the court to consider matters outside the pleadings. Dorfman v. First Boston Corp., 336 F. Supp. 1089, 1096 (E.D.Pa.1972). The Advisory Committee's Note to the 1966 amendment states:

> The addition at the end of subdivision (b) makes it clear that on a motion under Rule 12(b)(6) extraneous material may not be considered if the court excludes it, but that *if the court does not exclude such material the motion shall be treated as a motion for summary judgment* . . . . (emphasis added.)

---

15. Although it is not a relevant concern in view of *F. T. C. v. National Cas. Co., supra,* and its progeny, plaintiffs do not appear to contend that regulation by the Pennsylvania Insurance Department is perfunctory in character.

16. We do not see our holding as inconsistent with the Insurance Department's earlier refusal to accept filing of the seller charge as a fee. First, we have no reason to assume that the seller charge was actually unregulated during this period. The Department's view that the charge was not a "fee" did not preclude its regulation under a number of other provisions, and the Department never

suggested that it had no power to regulate the seller charge simply because it was not a "fee." The fact that the Department did not forbid use of the seller charge or alter the manner of its imposition during this period does not necessarily connote lack of regulation, for the Department can obviously regulate by silent approval as well as by disapproval. Secondly, the seller charge was regulated in that revenues derived from it were taken into account when the Department refused on June 1, 1970, to approve a rate increase proposed by the Rating Bureau. These points are significant with respect to plaintiffs' claims for past treble damages.

Although the body of this opinion makes clear that we are likely to uphold the claimed McCarran-Ferguson exemption, because we have in this opinion adverted to matters outside the complaint we must face the question whether we can properly dismiss the complaint without violating the rule 12 mandate to treat motions to dismiss as on summary judgment where we do not exclude matters outside the pleadings placed before the court.

B. *The Propriety of Treating Defendants' Motions as Simple Motions to Dismiss*

 Undoubtedly, certain matters outside the pleadings are cognizable on motion to dismiss. We would limit such cognizable matters, however, to those facts which are properly the object of strict judicial notice. This includes the statutes of Pennsylvania. Hanley v. Donoghue, 116 U.S. 1, 6 S.Ct. 242, 29 L. Ed. 535 (1885); Gallup v. Caldwell, 120 F.2d 90 (3d Cir. 1941). Furthermore, judicial notice may be taken of matters of common knowledge, that is, any fact "so commonly known in the community as to make it unprofitable to require proof, as so certainly known as to make it indisputable among reasonable men." C. McCormick, Law of Evidence § 324 (1954). We believe that this definition encompasses our discussion of the nature of the title insurance business. The materials dealing with regulation of the seller charge by the Insurance Department are not all public documents, but we are certain neither their authenticity nor their contents is in dispute. The position statement from the Insurance Department merely served us as a further legal brief on the scope of the Pennsylvania laws regulating title insurance. Thus we believe that we may have discretion to decide the exemption issue on motions to dismiss.[17] However,

we also have discretion to treat the motions before us as summary judgment motions, and we have found several reasons suggesting that such a course would be a better exercise of our discretion.

First, we are impelled toward caution by a footnote in a recent Third Circuit opinion, Doctors, Inc. v. Blue Cross, 490 F.2d 48 (3d Cir. 1973), which reversed dismissal of an insurance antitrust case for lack of interstate commerce allegations. Footnote 2 reads as follows:

2. The memorandum of Blue Cross in support of this motion also suggested that the court should grant the motion because their activities are exempt from the Sherman Act by reason of the McCarran-Ferguson Act, 15 U. S.C. §§ 1011–15 (1970). That statute exempts the insurance industry from antitrust liability to the extent it is regulated by state law.

While this claim might later prove to be meritorious, we express no opinion on it now, since it is not properly before us. The motions to dismiss were filed before either defendant submitted an answer. *As a result, the essential facts necessary to support this claim of immunity have not as yet been pleaded.* In addition, the applicability of the McCarran-Ferguson Act was not considered by the district court and was not briefed by either defendant in the present appeal. (emphasis added.)

The italicized sentence intimates a view that, in the *Doctors, Inc.* case at least, a McCarran-Ferguson defense could not be adjudicated on the allegations of the complaint alone.

Secondly, some aspects of the not entirely lucid law of judicial notice recommend to us that the case not be disposed of at this stage in reliance on judicial notice. Wigmore treats judicial notice

17. Indeed, the teaching of Ohio AFL–CIO v. Insurance Rating Bd., 451 F.2d 1178 (6th Cir. 1971), cert. denied, 409 U.S. 917, 93 S. Ct. 215, 34 L.Ed.2d 180 (1972), and Commander Leasing Co. v. Transamerica Title Ins. Co., 477 F.2d 77 (10th Cir. 1973), both discussed earlier, is that we need look no further than the regulatory statute and common knowledge about the workings of title insurance to decide the exemption issue.

as a substitute for the offering of evidence, and subject to dispute by the offering of contrary evidence. 9 J. Wigmore on Evidence § 2567 (3d ed. 1940):

> [T]he Court *assumes* that the matter is so notorious that it will not be disputed. But the *opponent is not prevented from disputing* the matter by evidence, if he believes it disputable.

*Accord*, United States v. Aluminum Co. of America, 148 F.2d 416, 446 (2d Cir. 1945) (L. Hand, J.). Thus, says Wigmore, the exercise of judicial notice must be requested by a party; and in fairness, notification must be given the opponent, so as to afford him an opportunity to dispute the facts judicially noticed. Wigmore § 2568. *Accord*, Soley v. Star & Herald Co., 390 F.2d 364 (5th Cir. 1968).[18] Additionally, whether we may take judicial notice of the rating bureau's correspondence with the Insurance Department regarding the seller charge is not entirely clear.

Thirdly, in view of all the material which has been placed before us, we feel that the better exercise of discretion is to treat the motions as ones for summary judgment. *See* Martin v. Johnson, 471 F.2d 704 (6th Cir. 1973); Thompson v. New York Central R. R., 361 F.2d 137, 138–139 (2d Cir. 1966); Gager v. "Bob Seidel," 112 U.S.App.D.C. 135, 300 F.2d 727, cert. denied, 370 U.S. 959, 82 S.Ct. 1612, 8 L.Ed.2d 825 (1962).

For the foregoing reasons, we will treat the motions to dismiss as motions for summary judgment.

### C. *The Motions for Summary Judgment*

██ Rule 12(b), quoted above more fully, dictates that when a motion to dismiss for failure to state a claim is treated as a motion for summary judgment, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." More than ample time has passed since the presentation to the court of matters outside the pleadings, thus affording all parties the required "reasonable opportunity" to put other materials before the court. Implicit in the "reasonable opportunity" provision, however, is also a notice requirement. The parties are entitled to notice that the motion to dismiss is being treated as a summary judgment motion. Scott v. Courtesy Inns, Inc., 472 F.2d 563 (5th Cir. 1973) (the court should give parties at least the ten days' notice required before hearing by rule 56(c)); Gould, Inc. v. Chafee, 146 U.S.App.D.C. 206, 450 F.2d 667 (1971); Mills v. Larson, 56 F.R.D. 63 (W.D.Pa.1972); *see* Advisory Committee Note to 1966 Amendment:

> It will also be observed that if a motion under Rule 12(b)(6) is thus converted into a summary judgment motion, the amendment insures that both parties shall be given a reasonable opportunity to submit affidavits and extraneous proofs *to avoid taking a party by surprise through the conversion of the motion into a motion for summary judgment.* (emphasis added.)

Accordingly, while the motion for summary judgment is likely to be granted, we will defer entering an order thereon for 45 days, which will afford the parties 30 days to submit additional materials pertinent to the rule 56 motion, and 15 days thereafter to file supplemental briefs. If the plaintiffs advise the court that they have nothing additional to submit, or if their submission does not persuade us to reverse our provisional ruling, we will grant summary judgment in favor of all defendants at that time.

---

18. This case reversed the district court, holding that in taking judicial notice of court records, the court must apprise the litigants of what it is doing. Opined Judge Goldberg, [L]itigants and counsel must not be required to be clairvoyant. They cannot read over the judge's shoulder or penetrate his memory. Nor can we [the appellate court]. From Shakespeare's *Hamlet* to Albee's *Tiny Alice*, soliloquies and asides have been shared with the audience. 390 F.2d at 369–370.