**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**TITLE INSURANCE RATING BUREAU OF ARIZONA, INC., Defendant-Appellant.**

**No. 82–5130.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 15, 1982.

Decided March 7, 1983.

[redacted]

[redacted]

[redacted]

Philip P. Berelson, Brown & Bain, P.A., Phoenix, Ariz., John F. Graybeal, John C. Christie, Washington, D.C., for defendant-appellant.

Stephen Ross, Gordon L. Lang, David A. Blotner, Antitrust Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Kenneth R. Reed, Sp. Asst. Atty. Gen., Phoenix, Ariz., for amicus curiae.

Before POOLE and BOOCHEVER, Circuit Judges, and McNICHOLS,* Senior District Judge.

BOOCHEVER, Circuit Judge:

The United States, Arizona and two private plaintiffs sued the Title Insurance Rating Bureau of Arizona, Inc. ("TIRBA") for fixing the prices of escrow services. Plaintiffs were granted summary judgment, despite two defenses offered by TIRBA: the McCarran-Ferguson Act exemption for the "business of insurance" and the state action immunity. The judgment of the district court is affirmed.

FACTS

TIRBA is a title insurance rating bureau licensed by the State of Arizona. It has thirteen insurer members and additional subscribers, all engaged in the business of title insurance.

Prior to 1977, Arizona law required title insurers to file only their title insurance rates with the state director of insurance. Ariz.Rev.Stat.Ann. § 20–376 (amended 1977). In 1977, the statute was amended to require title insurers to file their rates

---

* The Honorable Ray McNichols, Senior United States District Judge for the District of Idaho, sitting by designation.

charged for escrow services. Ariz.Rev.Stat. Ann. § 20–376 (West Supp. 1982–1983). A title insurer was allowed to file its own rates, or, at its option, to have a title insurance rating bureau of which it was a member or subscriber file rates on its behalf. Ariz.Rev.Stat.Ann. §§ 20–376(A–C). The statute authorizes but does not require cooperative action by title insurance companies in rate making.

In October and November 1977, TIRBA's Board of Directors held a series of meetings at which escrow rates for services performed by title insurers and their agents were discussed and classified. On November 7, the TIRBA Board approved its rate schedule for escrow services and authorized its submission to the Arizona Department of Insurance. The schedule was delivered to the department, which approved it. Amendments, corrections and additions were filed over the next few months, which were also approved.

On September 23, 1980, the United States filed this action pursuant to section 4 of the Sherman Act, 15 U.S.C. § 4 (1976), to enjoin and restrain TIRBA from engaging in continuing violations of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Specifically, the government alleged that TIRBA, its members, and its subscribers engaged in an illegal combination to fix and maintain fees for escrow services in Arizona. Two private actions were filed by individual plaintiffs on their own behalf and as representatives of the class of those who had purchased escrow services in the state after September 23, 1976. The State of Arizona filed a complaint similar to the one filed by the United States, for itself and 100 political subdivisions of the state which had purchased escrow services, and as *parens patriae* on behalf of all persons in the state who had purchased escrow services. The private plaintiffs and the state sought treble damages as well as injunctive relief. These parties settled their claims with TIRBA and are not affected by this appeal.

On June 23, 1981, the district court granted the federal government's motion for summary judgment and denied TIRBA's motion for summary judgment. *United States v. Title Insurance Rating Bureau of Arizona, Inc.*, 517 F.Supp. 1053 (D.Ariz. 1981). On December 21, 1981, the district court entered a final judgment in favor of the United States.

Two issues are presented in this appeal:

1. Is the provision of escrow services by title insurers part of the "business of insurance" exempted from the Sherman Act by the McCarran-Ferguson Act?

2. Is uniform price setting by title insurers immune from the Sherman Act under the state action doctrine where state law allows insurers to file their rates through a rating bureau?

## DISCUSSION

### I.

### Standard of Review

The parties have stipulated to the facts. The questions presented are solely issues of law. On an appeal from summary judgment, this court's review is identical to that of the trial court, *i.e.*, a *de novo* determination of the legal issues involved. *State ex rel. Edwards v. Heimann*, 633 F.2d 886, 888 n. 1 (9th Cir.1980).

### II.

### McCarran Act Exemption

Various title insurers jointly set their prices for escrow services and filed those rates with the state through TIRBA. Section 2(b) of the McCarran Act provides that the federal antitrust laws shall be applicable to the "business of insurance" to the extent that such business is not regulated by state law. 15 U.S.C. § 1012(b) (1976). Thus, the question is whether the provision of escrow services by title insurance companies is part of the business of title insurance.

 In considering the McCarran Act exemption it is important to keep in mind the Supreme Court's warnings that the exemption is a limited one; it is to be narrowly construed; and that it exempts the "business of insurance" and not the "business of

insurance companies." *Union Labor Life Insurance Company v. Pireno,* —— U.S. ——, 102 S.Ct. 3002, 3007, 3010, 73 L.Ed.2d 647 (1982). Also, it is not dispositive that Arizona law defines the "business of title insurance" to include "the performance by a title insurer or title insurance agent of escrow services," Ariz.Rev.Stat.Ann. § 20-1562(2)(b) (West Supp.1982–1983), because the definition of "business of insurance" for McCarran Act purposes is a matter of federal law. *Securities and Exchange Commission v. Variable Annuity Life Insurance Co.,* 359 U.S. 65, 69, 79 S.Ct. 618, 620, 3 L.Ed.2d 640 (1959).

The Supreme Court has discussed the meaning of the "business of insurance" in several recent cases. None, however, discusses title insurance.

In *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261, *reh'g denied,* 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), Blue Shield entered into agreements with pharmacies whereby participating pharmacies would supply prescription drugs at their cost plus $2. A nonparticipating pharmacy brought an antitrust action alleging a price fixing agreement between Blue Shield and the participating pharmacies. Blue Shield defended on the basis that the agreements were part of the "business of insurance" under § 2(b) of the McCarran Act.

The Supreme Court disagreed. Looking to the structure of the McCarran Act and its legislative history, the Court discussed three characteristics of the "business of insurance" that Congress had intended to exempt through § 2(b).

First, the Court observed that parts of the legislative history of the Act "strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk." 440 U.S. at 220–21, 99 S.Ct. at 1078. Blue Shield's Pharmacy Agreements did not spread or underwrite risks; they merely enabled Blue Shield to minimize costs in supplying drugs and thus to maximize profits.

Second, in enacting the McCarran Act, Congress had been concerned with the "re-lationship between insurer and the insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'" 440 U.S. at 215–16, 99 S.Ct. at 1075. The Pharmacy Agreements were not "between insurer and insured." The mere fact that the agreements resulted in cost savings which might result in lower insurance premiums bears too tenuous a relationship to the business of insurance to be controlling. If accepted, this argument would shield as the business of insurance almost every decision made by an insurance company resulting in enhanced income or lower costs.

Finally, the Court noted that in enacting the McCarran Act the primary concern of Congress was to exempt cooperative rate-making from the antitrust laws. Therefore, the exemption is limited to parties within the insurance industry. Thus, the § 2(b) exemption was inapplicable because the Pharmacy Agreement was with druggists, who are wholly outside the insurance industry.

Recently, the Supreme Court reaffirmed the *Royal Drug* analysis of the McCarran Act in *Union Labor Life Insurance Co. v. Pireno,* —— U.S. ——, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). Union Labor Life Insurance ("ULL") issued health insurance policies covering certain chiropractic treatments, but limited the company's liability to "reasonable" charges for "necessary" medical care and services. ULL arranged with the State Chiropractic Association to use the advice of its Peer Review Committee to determine reasonable charges and necessary services. On several occasions the Committee determined that Pireno's treatments were unnecessary or his charges unreasonable. Pireno sued, alleging that ULL had used the Committee's peer review practices as a vehicle for a conspiracy to fix prices. ULL contended that its use of the Peer Review Committee was part of its "business of insurance."

The Supreme Court disagreed, finding *Royal Drug* to be controlling. First, ULL's use of the Peer Review Committee played

no part in the spreading or underwriting of the policyholder's risk. Second, ULL's use of the Committee was not an integral part of the policy relationship between the insurer and the insured. The use of the Committee to evaluate claims is separate and distinct from the contract between ULL and the insured, and at most results in a cost savings to ULL. Finally, with regard to the third *Royal Drug* criterion, it is plain that the peer review practices were not limited to entities within the insurance industry.

In applying the *Pireno-Royal Drug* criteria to the escrow situation, none of the cases cited by the parties are particularly helpful. The cases cited by TIRBA are closer factually,[1] but were decided prior to *Royal Drug,* when "an expansive perception of the 'business of insurance' requirement prevailed in a majority of the circuit courts of appeals." *Portland Retail Druggists Association v. Kaiser Foundation Health Plan,* 662 F.2d 641, 647 (9th Cir.1981). The cases cited by the government generally have the proper emphasis on risk spreading as an essential element of the business of insurance, but are less similar factually. We, therefore, shall proceed with our independent analysis of the criteria applicable to the facts of this case.

■ The first *Pireno-Royal Drug* requirement is that the practice have the effect of transferring or spreading risk. TIRBA contends that performance of escrow services is crucial to underwriting and spreading risks in that title insurers evaluate and define the risk to be insured during escrow. First, the escrow agent reviews documents demonstrating the removal of encumbrances which would otherwise have to be excluded from insurance coverage. Second, the escrow officer reviews documents which are not a part of the public title records,

but bear on the state of the title and the risk of defects. Third, the escrow officer is the only representative of the insurer who has personal contact with the parties to the real estate transaction, and thus, by requiring identification, is best able to detect forgeries.

The government denies the centrality of the escrow process to the definition and acceptance of risk. The government characterizes the escrow agent as a stakeholder performing merely ministerial functions. First, TIRBA members and subscribers have set prices for a broad range of escrow services where title insurance is not purchased, as for example where the escrow agent acts as the collection agent of a long term real estate-related debt. In this situation, the escrow activities are clearly not the business of insurance. Second, in the typical escrow situation, the escrow agent merely transfers title from seller to buyer and consideration for title from buyer to seller. Any other services provided by escrow agents are purely administrative with no unique insurance characteristics. Third, the use of escrow agents by title insurers to perform services that the title insurer could perform itself, such as verifying that liens have been removed, at most reduces costs to the insurer. But *Pireno* and *Royal Drug* both rejected the argument that mechanisms that merely reduce costs to the insurer are part of the business of insurance. 102 S.Ct. at 3010; 440 U.S. at 216–17, 99 S.Ct. at 1076.

We therefore conclude that the escrow process itself does not spread or underwrite title insurance risk.

■ The second requirement under *Pireno* and *Royal Drug* is that the challenged practice is an integral part of the policy relationship between the insurer and the insured, as opposed, for example, to Blue

---

1. *Commander Leasing Co. v. Transamerica Title Ins. Co.,* 477 F.2d 77 (10th Cir.1973); *McIlhenny v. American Title Ins. Co.,* 418 F.Supp. 364 (E.D.Pa.1976); *Schwartz v. Commonwealth Land Title Ins. Co.,* 374 F.Supp. 564 (E.D.Pa.1974). *Schwartz* considered an agreement by title insurers to fix prices through a rating bureau for "seller charges." The services provided for "seller charges" were essentially escrow services. 374 F.Supp. at 566 n. 2. The court held these services to be within the business of title insurance, but the expansive analysis of the McCarran Act clearly does not comport with *Royal Drug. See* 374 F.Supp. at 572–75.

Shield's Pharmacy Agreements in *Royal Drug,* which were side agreements for the purchase of drugs at a low price. TIRBA contends that the policy relationship is here at issue because the escrow process is essential in determining what risks will be accepted by the title insurer. The government counters that buying escrow services is separate from buying title insurance. First, some people who buy escrow services do not buy title insurance, and vice versa. Second, those who buy both enter into two separate agreements: one for title insurance, the other for escrow services. Third, escrow services are performed either by a separate department within insurance companies, or by independent agents who keep the entire escrow fee. In fact, three TIRBA participants do not perform escrow services at all, and exclusively use outside companies.

■ The final *Pireno-Royal Drug* criterion for the business of insurance is that the challenged practice must be limited to entities within the insurance industry. This requirement derives from Congress' intent to exempt joint ratemaking from the antitrust laws where authorized by state law. Thus, TIRBA's activity would seem at first glance to satisfy the third requirement. However, Congress seems to have envisioned a total horizontal restraint. The complication is that other entities besides insurance companies perform escrow services, so that immunizing price-setting by insurance companies who perform escrow services would distort competition by those who are not insurance companies. In *Perry v. Fidelity Union Life Insurance Co.,* 606 F.2d 468 (5th Cir.1979), *cert. denied,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980), an insurance company offered loans to finance insurance premium payments. The Fifth Circuit held that the loan operation by the insurance company was not part of the business of insurance:

> It would be anomalous to hold that Fidelity's premium financing activities are the "business of insurance" but that the identical activities of the finance company ... are not. The appropriate focus

is thus the nature of the activity itself, not the type of business that is conducting it.... [B]usiness activities of insurance companies not peculiar to the insurance industry are outside the scope of the "business of insurance."

606 F.2d at 470.

We conclude that application of the *Pireno-Royal Drug* criteria clearly indicates that performance of escrow services is not the "business of insurance" for the purposes of the McCarran Act exemption.

### III.

### State Action Immunity

■ Arizona law allows title insurers to file escrow rates through an insurance rating bureau. TIRBA argues that it is thus entitled to the state action immunity.

The Supreme Court recently restated the requirements for the state action immunity in *California Retail Liquor Dealers Association v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

> These decisions establish two standards for antitrust immunity under *Parker v. Brown* [317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315]. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself.

445 U.S. at 105, 100 S.Ct. at 943 (citation omitted).

TIRBA points to several sections of the Arizona Code regulating escrow filings that arguably articulate a state policy. Section 20–341 provides that "The purpose of this article is to ... authorize and regulate cooperative action among insurers in rate making ..." Ariz.Rev.Stat.Ann. § 20–341 (1975). Section 20–375(A) lists factors to be considered in setting rates. Rates should be neither excessive nor inadequate for the safety and soundness of any title insurer, should promote stable rate structures, should encourage the growth in assets of title insurers, and should allow for the payment of dividends in order to attract capital. Ariz.Rev.Stat.Ann. § 20–375(A) (West

Supp.1982–1983). (The listing of factors in the statute is not exclusive.) This section suggests that the stability and growth of title insurers were more important goals of the state legislature than restricting competition in the escrow industry.

The government points to other more relevant language in § 20–341: "Nothing in this article is intended to prohibit or discourage reasonable competition, or to prohibit or encourage, except to the extent necessary to accomplish the purpose stated in this section, uniformity in insurance rates ..." This reflects neutrality by the Arizona legislature to competition and uniform rates, not "a clearly articulated and affirmatively expressed state policy."

Importantly, the state does not require uniform rates: it allows a title insurer to file independent rates separately, to file independent rates through a rating bureau,[2] or to deviate from rates filed by a rating bureau on its behalf. Ariz.Rev.Stat.Ann. §§ 20–375(A), 20–376(B), 20–376(C), 20–379 (West Supp.1982–1983).

The most that can be said for TIRBA's position is that the statute authorizes cooperative action in rate-making. This does not constitute a clearly articulated and affirmatively expressed state policy to restrict competition. Because we find that the challenged practice was not supported by a clearly articulated and affirmatively expressed state policy, we do not consider *Midcal*'s second requirement, that the state must actively supervise its anticompetitive policy.

CONCLUSION

Neither the McCarran Act exemption nor the state action immunity is available to the challenged practices of TIRBA. The judgment of the district court is

AFFIRMED.

---

**2.** The relevant factors for determining escrow prices listed in Ariz.Rev.Stat.Ann. § 20–377 (West Supp.1982–1983) seem to suggest that individually set prices should be used even if prepared and filed by a rating bureau. *See also* Ariz.Rev.Stat.Ann. § 20–375(A) (West Supp. 1982–1983). *But see* § 20–341 (1975).